NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12349


COMMONWEALTH  vs.  KENYA DABNEY.



Suffolk.     November 6, 2017. - February 13, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Trafficking.  Deriving Support from Prostitution.  Rape.
    Assault and Battery.  Jury and Jurors.  Practice, Criminal,
    Jury and jurors, Voir dire, Instructions to jury.
    Evidence, Impeachment of credibility.  Witness,
    Impeachment.




Indictments found and returned in the Superior Court
Department on February 4, 2015.

The cases were tried before Linda E. Giles, J.

The Supreme Judicial Court granted an application for
direct appellate review.


David Rangaviz, Committee for Public Counsel Services, for
the defendant.
Nicholas Brandt, Assistant District Attorney, for the
Commonwealth.
Emma Quinn-Judge & Zoraida Fernandez, for Massachusetts
Association of Criminal Defense Lawyers & others, amici curiae,
submitted a brief.

GAZIANO, J.  The defendant was convicted by a Superior Court jury of human trafficking, deriving support from prostitution, rape, and two counts of assault and battery.  On appeal, he argues that, during voir dire, the judge improperly prevented his attorney from asking members of the venire whether they would expect an innocent defendant to testify.  He also contends that the evidence presented was insufficient to sustain a conviction of human trafficking, and that the judge's instruction to the jury regarding the human trafficking charge was inadequate.  The defendant claims further that the judge erred in allowing the introduction of certain records and then retroactively ordering them to be redacted, which prevented defense counsel from using the records for impeachment purposes.

We conclude that the judge did not abuse her discretion in limiting defense counsel's questioning during voir dire, the evidence against the defendant was legally sufficient, the jury instructions were proper, and there was no abuse of discretion in the judge's evidentiary ruling.  Accordingly, we affirm the convictions.[1]

---

[1] We acknowledge the amicus brief submitted by the Massachusetts Association Of Criminal Defense Lawyers, National Association of Criminal Defense Lawyers, Charles Hamilton Houston Institute for Race and Justice, and Criminal Justice Institute.

1. <u>Background</u>. a. <u>Facts</u>. We recite the facts the jury could have found, reserving certain details for later discussion.

i. <u>Commonwealth's case</u>. The victim and the defendant met in approximately June, 2014, and started dating a few months later. The two began living together in a house in Chelsea belonging to "Uncle Otis," a friend of the defendant; they also sometimes stayed in a house in Revere. Around the time the victim and the defendant started dating, the defendant encouraged the victim to begin prostituting herself. He told her that it "would be good money because [she] was a beautiful person." At some point before she met the defendant, the victim had engaged in prostitution in Chelsea.[2]

Shortly after the defendant's suggestion, the victim began prostituting herself on Pearl Street in Chelsea. In exchange for a cash payment, she would perform sex acts in her clients' vehicles. Together, the defendant and the victim determined the prices she would charge for various acts. The defendant would accompany the victim to Pearl Street and would wait on the street or at a nearby bar for her to emerge from a client's automobile. The victim gave all the money she earned from these

---

[2] The record does not indicate any time frame for the victim's prior prostitution.

encounters to the defendant. He used the money to buy drugs and alcohol for them to share.

At some point after the victim had been engaging in prostitution, the defendant told the victim about a Web site called Backpage that they could use to advertise her services. The two used the victim's personal electronic mail address and telephone number to create a Backpage account. They then posted advertisements, which included photographs of the victim's body, (without showing her face), a written description of her body, an "alias," and contact information. The defendant took the photographs. The victim and the defendant together determined the alias that the victim would use and wrote the description of her body. The defendant used proceeds from the victim's prostitution to buy a prepaid credit card that they used to pay for the Backpage advertisements.

The defendant told the victim that she was to notify him every time she received a telephone call from a client in response to the Backpage advertisement. He also occasionally listened to the calls. Often, these clients would meet the victim at the house in Revere where she and the defendant sometimes stayed. The defendant would wait in another room while the victim was with a client "in case [she] needed to scream for him." This arrangement continued for several months. At the time, the victim also was working at a fast food

restaurant; the defendant was unemployed. In November or December, 2014, after a gap in their relationship "for a day or two," the defendant asked the victim to stop using the Backpage site. She did so and also changed her telephone number.

At some point during the week of December 7, 2014, the defendant punched the victim in the face because she had not given him all of the money she had earned from prostitution. The victim had a black eye, but did not seek medical treatment. She did not call the police because the defendant "apologized and said it wouldn't happen again."

Approximately one week later, on December 13, 2014, the defendant hit the victim's head with his open hand. Later that night, the victim, the defendant, the victim's mother, and Uncle Otis were at the house in Revere; the defendant and the victim used cocaine and heroin. Sometime after midnight, the victim and the defendant went to a bar, where he told her that she was "on [her] own." The victim understood this to mean that they were no longer in a relationship, and left the bar.

The victim then went to Pearl Street to prostitute herself. She saw two clients. Thereafter, she encountered the defendant on the part of Pearl Street where he ordinarily had waited for her when she met with clients. The defendant yelled at her and demanded to know why it had taken her so long to return. She responded, "why are you over here, you said I was on my own."

The defendant punched the victim in the face, threw her to the ground, and kicked her, while continuing to yell. He grabbed her and told her that they were going home. He insisted that the victim was lying to him about the clients she had met with that night and the amount of money she had received. He continued to punch her, throw her against walls, choke her, and beat her, as he dragged her toward a taxicab stand. The victim continued to protest that she thought their relationship had ended. The defendant responded, "you're going with me and that's it."

As the victim and the defendant were entering a taxicab, two police officers arrived in response to a 911 call that a neighbor had placed; the neighbor had been awakened when he heard a woman screaming and reported that two women were fighting.[3] As the officers approached, the defendant held a switchblade to the victim's side and told her that if she said anything to the police officers about the incident, he would kill her. The officers interviewed the victim and the defendant separately, but the victim was afraid and did not tell them what had happened. The victim said that she had been fighting with another woman and that she did not want to press charges. The

---

[3] The caller did not see the faces of the people involved in the fight. A bystander also reported that she heard a woman screaming, but did not see the people involved.

officer interviewing the victim noticed that she had a bruise under her eye that appeared to be "several days old and yellow," but did not observe any fresh injuries. The officers did not see anyone else nearby. They left, and the victim and the defendant took a taxicab back to Uncle Otis's house. The victim's mother was staying at the house that night and inquired about the victim's injuries. Because the defendant was in the room when she did so, the victim lied and said that she had been "jumped" by two women.

After the victim's mother had gone to bed, the defendant pushed the victim into the bathroom and pulled off her pants and underwear, while the victim repeatedly protested. The defendant forced his hands into her vagina. He said that he was going to kill her with his switchblade, and "tried" to stab her side and her leg until the knife broke. He then ordered the victim to sit on the living room couch and continued to hit her. When the victim asked to share some of the cigarette the defendant was smoking, he put the cigarette out on her face, again accused her of lying, and repeated that he was going to kill her.

The victim managed to run into the bedroom where her mother was sleeping, and woke her mother up. The victim was "crying very hard." Her mother then confronted the defendant. He responded that he no longer wanted to be in a relationship with the victim, and asked if she was going to call the police. The

victim and her mother did not call the police, because they did not want Uncle Otis to "get in trouble and lose his house."  The victim slept that night in the same room with her mother.

When the victim woke up the next morning, the defendant and his belongings were gone.  Her mother arranged for a relative to take the victim to the hospital.[4]  While the victim was at the hospital, an officer of the Chelsea police department interviewed her.  He noticed that the victim had a swollen eye, scratches and marks on her neck, puncture wounds on her leg, an abrasion near her hip, and a burn mark on her face.  The officer subsequently arrested the defendant.[5]

ii.  <u>Defendant's case</u>.  The defendant called a nurse who served as a medical consultant to explain the contents of the victim's hospital records.  The nurse had not treated the victim and had not met with her prior to testifying.  The nurse explained that, based on the victim's computerized tomography (CT) scan, the doctors had concluded that the victim was suffering from swelling on the frontal bone of her skull, but

---

[4] The victim received treatment for her injuries but declined a sexual assault examination, saying that she was in too much pain.

[5] The defendant tried to telephone the victim several times after the assault, but she did not answer.  While the defendant was in pretrial detention, however, the victim sent him a letter saying, "what was done was not my doing."  The letter also asked the defendant to telephone her and said that she had never loved anyone as much as she loved him.

had no brain injury.  The victim also had a deformity or chip
fracture of her jaw bone, without swelling or bruising in that
area.  The victim had swelling, bruising, and internal bleeding
on her forehead, near her eyes, and on her nose and chin, and
complained of lower back pain.  The records indicated that the
victim told the treating physicians that she had not lost
consciousness during the incident, and contained no indication
of any stab wounds or treatment for stab wounds.  The hospital
records stated that the victim had a burn on her cheek, but
there was no indication that she was treated for a cigarette
burn.  The nurse opined that the mark on the victim's cheek
"could" be a cigarette burn, but that it did not look like the
cigarette burns she had seen in her own experience; based on the
photographs taken by the investigating officer, the mark was
superficial, had an irregular shape, and looked several days
old.  At the hospital, the victim had complained of blurred
vision, but her vision test revealed entirely normal results
with textbook acuity.

     b.  Procedural history.  A grand jury returned indictments
against the defendant for eleven charges.  He was indicted on
charges of human trafficking, in violation of G. L. c. 265,
§ 50 (a), and deriving support from prostitution, in violation
of G. L. c. 272, § 7, for the period from September 1 to
December 14, 2014.  He also was indicted on two counts of

assault and battery, in violation of G. L. c. 265, § 13A. For the incident on the evening of December 13 and the early morning hours of December 14, 2014, the defendant was indicted on charges of rape, G. L. c. 265, § 22; assault and battery by means of a dangerous weapon (a lit cigarette and a knife), G. L. c. 265, § 15A; assault by means of a dangerous weapon (a knife), G. L. c. 265, § 15B (b); strangulation, G. L. c. 265, § 15D (a); assault and battery, G. L. c. 265, § 13A; and intimidation of a witness, G. L. c. 268, § 13B.

The defendant moved unsuccessfully to have the human trafficking charge dismissed, arguing that the Commonwealth did not present sufficient evidence to the grand jury, and that the human trafficking statute was unconstitutionally vague as applied to him.

Ultimately, the jury found the defendant guilty of human trafficking, deriving support from prostitution, rape, and two counts of assault and battery, one for the punching incident between December 1 and 10, 2014, and one for the events on the evening of December 13 and the early morning hours of December 14, 2014. He was acquitted of the other charges. The defendant timely appealed, and we allowed his petition for direct appellate review.

2. Discussion. The defendant argues that the judge erred in prohibiting defense counsel from asking most of the members

of the venire whether they would expect an innocent defendant to testify, because the question was proper and useful in revealing juror bias.  The defendant also maintains that the evidence was not sufficient to support his conviction of human trafficking because there was no indication that he forced or coerced the victim into prostitution, and that the judge's instruction on that offense was insufficient to convey to the jury the statute's proper meaning.  In addition, the defendant argues that the judge erred in denying his motion to use Backpage records to impeach the victim, and in ordering that the records be redacted in such a way that they could not be used for impeachment purposes, even though the Commonwealth earlier had introduced unredacted copies of the records.

a.  <u>Questioning of the venire on the defendant's right not to testify</u>.  i.  <u>Empanelment</u>.  At trial, the defendant moved for attorney-conducted voir dire.  The judge permitted the attorneys the "opportunity to ask reasonable follow-up questions" based on anything "see[n], hear[d], or read about the juror."  The judge began jury selection by asking the entire venire several questions, including three that are statutorily required:

> (1) "Do any of you not understand that in a criminal case, the defendant is presumed innocent until proven guilty?";
>
> (2) "Do any of you not understand that in a criminal case, the prosecution has the burden of proving the defendant is guilty beyond a reasonable doubt?"; and

(3) "Do any of you not understand that in a criminal case, the defendant does not have to present any evidence in his or her own behalf?"

See G. L. c. 234A, § 67A.  Thereafter, at sidebar, the judge questioned each potential juror individually.  One of the questions she posed was, "The defendant in a criminal trial has the absolute right not to testify.  If this defendant chooses not to testify, would you hold that against him in any way?"  After the judge finished her questioning, she allowed the attorneys to pose follow-up questions.

In response to the judge's question on a defendant's right not to testify, the first member of the venire said he would not hold it against the defendant if the defendant chose not to testify.  Defense counsel then asked, "The judge asked you about the possibility of the defendant not testifying.  If someone was innocent, would you expect that they would testify or would not testify?"  The juror responded, "No, either way."  When that juror stepped away, the judge commented that defense counsel had asked redundant questions, and told him "not [to] ask the same question that [she] ask[ed]."  The first juror was empanelled.

In response to the same question from the judge, the second potential juror also indicated that he would not hold it against the defendant if the defendant chose not to testify.  Defense counsel then asked, "The judge mentioned that the defendant has the right not to testify.  Would you expect that if someone was

innocent, that they would testify or not necessarily?" The juror responded "Well, he don't have the right to, so he don't have to testify." When that juror stepped away, the judge noted that defense counsel's question was redundant. Counsel responded that a colleague had told him that the phrasing he had employed was a useful addition because a potential juror might not fully comprehend the judge's more abstract question. The judge said that she would "engage in an experiment" and also would permit defense counsel to ask whether the juror would expect an innocent defendant to testify, in order to determine if jurors gave different responses to the two questions. The second juror was empanelled.

The next three potential jurors were excused for cause before defense counsel had an opportunity to pose his version of the question on a defendant's right not to testify. In response to the judge's question, the sixth juror stated that he would not hold it against the defendant if the defendant chose not to testify. Defense counsel then asked, "Would you expect that a defendant who is innocent would testify, whether he has to or not?" and the juror responded, "No, not necessarily." The juror was empanelled.

The seventh potential juror also responded to the judge's question by saying that she would not hold it against the

defendant if he did not testify.  During defense counsel's subsequent questioning, the following exchange took place:

> Defense counsel:  "Regardless of whether the defendant has a right to testify or not, would you expect that an innocent defendant would testify?"
>
> The juror:  "I would think, but I don't -- I'd be open to hearing or not hearing.  I don't know if that makes sense."
>
> The judge:  "I'm not sure I understand."
>
> The juror:  "You're asking if he is claiming he's innocent --"
>
> The judge:  "You have to keep your voice up a little bit."
>
> The juror:  "Oh, I'm sorry.  If you're claiming that he is innocent and he did testify, do I have -- I'm sorry."
>
> The judge:  "Put the question to her again, I think she's confused by the question."
>
> Defense counsel:  "If he was innocent, would you expect that he probably would testify?"
>
> The juror: "Yes."
>
> Defense counsel:  "How come?"
>
> The juror:  "Just to defend himself and he would have probable cause."

The judge asked the potential juror to step away, and then noted that she had realized why she initially did not like counsel's question.  She commented that it was a "commitment question," in that it asked jurors to commit to a particular position by planting in a juror's mind the idea that the defendant was

actually innocent and therefore should testify.  She explained that, although a defendant is presumed innocent, "[t]he issue is whether [the Commonwealth] can prove [its] case beyond a reasonable doubt.  Innocence is not an issue in this case."[6]  The judge did not permit defense counsel thereafter to ask his form of the question, but did offer to excuse the juror for cause. Counsel agreed that the juror should be excused, and asked the judge to note his objection.

ii.  Attorney conducted voir dire.  "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors."  Morgan v. Illinois, 504 U.S. 719, 729 (1992).  See G. L. c. 234A, § 67A (voir dire is designed "to learn whether the juror is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice").  The scope of voir dire, however, "is in the sound discretion of the trial judge and will be upheld absent a clear showing of abuse of discretion."  Commonwealth v. Gray, 465 Mass. 330, 338,

_____

[6] See Anderson v. State, 161 Ga. App. 816, 816 (1982) (trial judge did not err in declining to permit defense attorney to ask whether jurors "would still expect the defendant to take the stand and testify as to his innocence" even if they knew that defendant did not have burden of proving his innocence, because question "sought to have the jurors prejudge how they might view the defendant's failure to testify").

cert. denied, 134 S. Ct. 628 (2013), quoting Commonwealth v.

Perez, 460 Mass. 683, 689 (2011).

Prior to 2014, judges had discretion not to permit

attorneys to engage in direct questioning of potential jurors.

See Commonwealth v. Gee, 6 Cush. 174, 178 (1850) ("The counsel

of a party has no right personally to interrogate the jurors,

with a view of showing their bias or prejudice by facts drawn

out by a cross-examination, or something very like it").  In

2014, however, the Legislature amended G. L. c. 234, § 28, such

that, upon request, attorneys and self-represented parties in

the Superior Court now have the right to question potential

jurors during voir dire.  See St. 2014, c. 254, § 2.[7]  Although

"the empanelment process takes somewhat longer when attorneys

participate in voir dire, the consensus is that [attorney

participation in voir dire] has improved the process of jury

selection.  As a result, judges and attorneys should have

greater confidence that the jurors who are ultimately empaneled

are more likely to be impartial."[8]  Supreme Judicial Court

---

[7] In 2016, this section was recodified as G. L. c. 234A,
§ 67D.  St. 2016, c. 36, § 4.

[8] Our committee on juror voir dire, which was convened soon
after the statute was enacted, observed that forty-four per cent
of Superior Court judges had been permitting some form of
attorney-conducted voir dire prior to the enactment, and "while
[G. L. c.] 254 would push attorney involvement further, it could
be implemented without radical changes to the judges' current

Committee on Juror Voir Dire, Final Report to the Justices, at 5 (July 12, 2016) (SJC Committee Report). Nonetheless, while trial judges must permit attorney-conducted voir dire upon request, the scope of such questioning remains in the discretion of the judge. See, e.g., G. L. c. 234A, § 67D (2) ("The court may impose reasonable limitations upon the questions and the time allowed during such examination, including, but not limited to, requiring pre-approval of the questions").

To implement the statutory requirement, the Superior Court adopted Standing Order 1-15 (effective Feb. 2, 2015), which "fully preserves the discretionary authority of the trial judge with respect to the examination and selection of jurors in each case . . . while permitting attorneys and self-represented parties a fair opportunity to participate in voir dire so as to identify inappropriate bias." The standing order requires judges, in deciding which questions to allow, to give "due regard" to the goals of selecting fair and impartial jurors, conducting jury selection with "reasonable expedition," and "respecting the dignity and privacy of each potential juror." Id. See SJC Committee Report, supra at 11.

---

approaches to jury selection in civil and criminal cases." Supreme Judicial Court Committee on Juror Voir Dire, Final Report to the Justices, at 3 (July 12, 2016) (SJC Committee Report).

Superior Court Rule 6, which was put in place after Standing Order 1-15, provides guidance to judges when making determinations regarding attorney-conducted voir dire. A trial judge may "impose reasonable restrictions on the subject matter, time, or method of attorney or party voir dire." Rule 6(3)(f) of the Rules of the Superior Court. Pursuant to rule 6(3)(e), attorneys may not ask questions that (1) are "framed in terms of how the juror would decide this case (prejudgment), including hypotheticals that are close/specific to the facts of this case"; (2) "seek to commit juror(s) to a result, including, without limitation, questions about what evidence would cause the juror(s) to find for the attorney's client or the party"; (3) have "no substantial purpose other than to argue an attorney's or party's case or indoctrinate"; (4) concern the outcome of "prior cases where the person has served as a juror, including the prior vote(s) of the juror or the verdict of the entire jury"; or (5) "specifically reference what is written on a particular juror's confidential juror questionnaire" while in the presence of other jurors.

By contrast, trial judges "should generally approve a reasonable number of questions" concerning (1) "the prospective juror's background and experience pertinent to the issues expected to arise in the case"; (2) "preconceptions or biases relating to the identity of the parties or the nature of the

claims or issues expected to arise in the case";[9] (3) the juror's "willingness and ability to accept and apply pertinent legal principles as instructed"; and (4) "information on subjects that controlling authority has identified as preferred subjects of inquiry, even if not absolutely required."  Rule 6(3)(c) of the Rules of the Superior Court.  Further, if a party or attorney wishes to inquire about potential jurors' political views, voting patterns, party preferences, or religious beliefs or affiliations, the litigant first must explain to the judge's satisfaction "how the inquiry is relevant to the issues, may affect the juror's impartiality, or may assist in the proper exercise of peremptory challenges."  Rule 6(3)(d) of the Rules of the Superior Court.

There is no dispute in this case that defense counsel sought to ask his particular form of the question on the defendant's right not to testify in an effort to reveal juror bias, an entirely appropriate line of inquiry.  That the question was well intentioned and directed to proper subject matter, however, does not necessarily mean that the judge's

---

[9] Superior Court Rule 6 explicitly encourages judges to consider whether proposed questions or methods may assist in identifying explicit or implicit bias.  Rule 6(3)(g) of the Rules of the Superior Court.  This court also has endorsed "Best Practices for Jury Selection" proposed by the Committee on Juror Voir Dire, that encourage the same considerations.  See Best Practices For Jury Selection (July 20, 2016); SJC Committee Report, supra at 11.

decision not to permit it was error.  In addition to discretion to exclude inappropriate topics, judges have broad discretion with regard to the specific question or language used to probe appropriate subject matter.  See Addendum A(1) to the Rules of the Superior Court ("The trial judge may, in the exercise of discretion, require attorneys and self-represented parties to submit the specific language of the proposed questions for pre-approval").[10]  This discretion encompasses a judge's ability to

_____

[10] There is broad consensus among courts in other jurisdictions that judges have discretion over the wording, and not merely the subject matter, of voir dire questions.  See, e.g., Kasi v. Angelone, 300 F.3d 487, 509 (4th Cir.), cert. denied, 537 U.S. 1025 (2002) ("trial court has broad discretion in conducting the voir dire of the jury, and particularly in phrasing the questions to be asked" [quotations omitted and citation]); State v. Colon, 272 Conn. 106, 171-173 (2004), cert. denied, 546 U.S. 848 (2005) (trial court did not abuse its discretion in sustaining State attorney's objections to phrasing of defense counsel's statement during voir dire that "the presumption of innocence says you have to presume [the defendant] innocent, perfectly clean slate as he sits here" and "the jurors have to presume an accused person completely innocent of any wrongdoing," as judge provided defense counsel sufficient other questions to probe jurors' views regarding presumption of innocence [emphasis in original]); Dingle v. State, 361 Md. 1, 13 (2000) ("the trial court has broad discretion in the conduct of voir dire, most especially with regard to the scope and the form of the questions propounded"); State v. Parks, 324 N.C. 420, 423 (1989) ("while counsel may diligently inquire into a juror's fitness to serve, the extent and manner of that inquiry rests within the trial court's discretion"); Hyundai Motor Co. v. Vasquez, 189 S.W.3d 743, 755 (Tex. 2006) ("Determining whether jurors' answers assume or ignore the evidence disclosed to them turns on the courtroom context, and perhaps the looks on their faces.  So, too, does the import of counsel's questions, and whether as phrased they seek external information or a preview of a potential verdict.

prevent posing questions that are likely to confuse, misinform, or mislead the jury because of their format or wording.

We conclude that the judge did not abuse her discretion in precluding defense counsel from asking the particular question he sought to use.  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  That some potential jurors may expect a defendant to testify if he or she were innocent does not, without more, mean that they cannot or will not put aside that expectation and honor the defendant's rights after being properly instructed.  Although the defendant correctly notes that counsel is not limited to questions that probe a juror's willingness to follow directions, and may inquire into a jurors' beliefs on relevant issues, a potential juror's expectation that a defendant will testify if innocent is often based on a lack of knowledge of the criminal justice system rather than on steadfast beliefs.  See Hopson v. Commonwealth, 52 Va. App. 144, 153 (2008) ("To be sure, it is not surprising that jurors would want or expect a defendant to testify; any conscientious juror naturally would want all the help he or she could get in deciding a case.  It should not be grounds for a per se exclusion, therefore, when prospective jurors on voir dire indicate their wants or expectations in this respect" [quotations and citation

The trial judge is in a better position to evaluate the reasonableness of both aspects -- the question and the answer").

omitted]).  Because the wording of defense counsel's question could be seen by some potential jurors as asking the juror to disregard the defendant's constitutional right not to testify, the question did not properly elicit information that could demonstrate the juror's ability to be fair and impartial.

The possibly confusing nature of counsel's question is evident from the replies of the seventh juror, which prompted the judge to preclude the question for the remainder of the voir dire.  In response to the question, "Regardless of whether the defendant has a right to testify or not, would you expect that an innocent defendant would testify?" the juror provided a series of confused answers:  "I would think, but I don't -- I'd be open to hearing or not hearing.  I don't know if that makes sense"; "You're asking if he is claiming he's innocent --"; and "If you're claiming that he is innocent and he did testify, do I have -- I'm sorry."  When the judge told counsel to pose the question again, he omitted the defendant's right not to testify altogether and simply asked, "If [the defendant] was innocent, would you expect that he probably would testify?" to which the juror's response remained unclear:  "Just to defend himself and he would have probable cause."

Although the judge's decision to engage in an "experiment" may have been unconventional, her decision to revisit her prior ruling was not.  See, e.g., Commonwealth v. Gonzalez, 22 Mass.

App. Ct. 274, 277 n.5 (1986) ("even if nothing unexpected happens at trial, the [trial] judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling").  The record demonstrates that the judge was uncomfortable with defense counsel's question from the start, and precluded the question after the seventh juror's response showed that it might cause confusion.  The record does not support the defendant's suggestion that the judge decided to preclude the question because the experiment proved fruitful in revealing bias.  On this record, we conclude that the judge did not abuse her discretion in declining to allow defense counsel to continue posing this specific question, and instead choosing to probe potential juror bias on the question of the defendant's right not to testify with her own form of that question.

b.  Sufficiency of the evidence.  The defendant argues that the Commonwealth did not present sufficient evidence to prove beyond a reasonable doubt that he was guilty of violating G. L. c. 265, § 50 (a), the so-called "human trafficking" or "sex trafficking" statute.  The defendant maintains that his actions could not constitute human trafficking because they did not involve force or coercion, and the victim willingly engaged in prostitution.

General Laws c. 265, § 50 (a), provides, in relevant part:

> "Whoever knowingly:  (i) subjects, or attempts to subject, or recruits, entices, harbors, transports, provides or obtains by any means . . . another person to engage in commercial sexual activity . . . or causes a person to engage in commercial sexual activity . . . shall be guilty of the crime of trafficking of persons for sexual servitude . . . ."[11]

The statute was enacted in 2011, when the Legislature recognized that the Commonwealth could not simply rely on Federal prosecutions to combat human trafficking, and needed to empower local authorities to assist.  See State House News Service (House Sess.), Nov. 15, 2011 (human trafficking statute was enacted "to make sure local law enforcement can devote their offices and resource[s] and not wait for [F]ederal intervention").  See also 2011 House Doc No. 3483, Senate Floor Debate, Nov. 14, 2011; House Approves Bill on Human Trafficking, Boston Globe, June 2, 2011 ("the human trafficking problem in Massachusetts is more likely to involve smaller bands of domestic groups rather than larger international slave trading. . . .  The [F]ederal government has laws against human trafficking, but often lacks resources to go after smaller offenders.  Prosecutors say the [S]tate law would make it easier to build cases that would fill in those enforcement gaps").  At

---

[11] The human trafficking statute also applies to anyone who "(ii) benefits, financially or by receiving anything of value, as a result of a violation of clause (i)."  G. L. c. 265, § 50 (a).  The jury were not instructed on this subclause, however, as the judge determined that it was inapplicable here.

that time, only three other States had not enacted some form of a human trafficking offense. See State House News Service (Senate Sess.), Nov. 15, 2011; 2011 House Doc. No. 3808, Senate Floor Debate, Nov. 14, 2011. While the statute clearly was enacted to fill a "gap," the Legislature also intended to "change the focus of police and prosecutors from targeting prostitutes to going after the men who pay for sex with them and the pimps who profit from the transactions." See Gov. Patrick Signs Bill Against Human Trafficking, Associated Press, Nov. 21, 2011. See also 2011 House Doc. No. 3808, Senate Floor Debate, supra; State House News Service (Senate Sess.), supra; New Law Aims to Shut Down Sex Trade Traffickers, Telegram & Gazette, Nov. 22, 2011.

Consistent with such Legislative intent, in Commonwealth v. McGhee, 472 Mass. 405 (2015), this court rejected the limited reading of the human trafficking statute that the defendant puts forth. In that case, the court observed that "the Legislature has determined that whether a person being trafficked for sexual servitude has been forced or coerced into engaging in such activities is immaterial for purposes of ascertaining whether a criminal act has been committed." Id. at 415. The defendants in McGhee had argued that, without an element of force or coercion, the statute was unconstitutionally vague because it could apply even to the act of "merely assisting a consenting

adult prostitute." Id. at 413. The court explained that use of the word "knowingly" in the statutory language showed that the statute's "clear and deliberate focus . . . is the intent of the perpetrator, not the means used by the perpetrator to accomplish his or her intent." Id. at 415. Therefore, "'merely assisting' an adult consenting prostitute will still constitute the crime of sex trafficking in those circumstances where all of the statutory elements have been satisfied" (emphasis in original).[12] Id. at 416.

Thus, here, the Commonwealth could meet its burden of proving that the defendant engaged in human trafficking by showing that he knowingly "subject[ed], or attempt[ed] to subject, or recruit[ed], entice[d], . . . transport[ed or] provide[d] . . . another person to engage in commercial sexual activity." See G. L. c. 265, § 50 (a); McGhee, 472 Mass. at 416. Viewed in its entirety, and in the light most favorable to the Commonwealth, the Commonwealth's case presented sufficient evidence that the defendant's conduct violated the human trafficking statute. The jury could have found that the defendant "enticed" and "recruited" the victim to engage in

---

[12] The defendant argues that if the human trafficking statute applies to those who assist willing prostitutes, it is unconstitutionally vague and overbroad. We have previously considered and rejected this argument. See Commonwealth v. McGhee, 472 Mass. 405, 412-420 (2015).

prostitution because he told her that she was beautiful and would make "good money" from prostitution, controlled the terms of her client visits, encouraged her to advertise on Backpage, and helped her pay for and set up the Backpage account.

The defendant contends that the statement in McGhee that the human trafficking statute does not require force or coercion was dicta, as it was undisputed that the victims in that case were coerced, and, in any event, according to the defendant, McGhee was wrongly decided. He challenges the analysis in McGhee that, by contrast to the earlier-enacted Federal statute prohibiting human trafficking, 18 U.S.C. § 1591, the Massachusetts statute omits the element of force or coercion, which McGhee explained "reflect[s] a conscious decision by the Legislature to deviate from the standard embodied in the Federal statute" (citation omitted). McGhee, 472 Mass. at n.8. The defendant maintains that this omission was because, under the Federal statute, coercion is a "defined and narrow term of art" that encompasses only threats of serious harm or abuse of the legal process. See 18 U.S.C. § 1591(e)(2). He suggests that the Massachusetts statute is more akin to another Federal statute, 18 U.S.C. § 2422, which punishes anyone who "knowingly persuades, induces, entices, or coerces any individual to engage in prostitution," and that the omission of force or coercion from the language of the Massachusetts statute does not mean

that the Legislature intended to dispense with the element of coercion altogether.

The defendant's interpretation of the statute is unconvincing.  Not only did the Legislature choose not to include the term "coercion" in the Massachusetts human trafficking statute, it also chose to omit the term "force," a term that does not have a specialized meaning under the Federal statute.  See 18 U.S.C. § 1591.  This suggests that the wording of the statute was not merely to avoid being constrained by the Federal definition of "coercion."  Additionally, if the primary concern of the Legislature were to avoid the narrow definition of "coercion" in the Federal statute, the Legislature could have enacted its own definition.  It did not do so.

The defendant also posits that because the Legislature has not repealed the statutes that criminalize deriving support from prostitution (G. L. c. 272, § 7) and aiding and abetting prostitution (G. L. c. 272, § 53, and G. L. c. 274, § 2), the Legislature must have intended the human trafficking statute to target a more traditional, narrow set of crimes involving force or coercion, rather than simple encouragement.  The reading of the human trafficking statute in McGhee, however, did not make these other statutes superfluous.  As the court explained, the statute criminalizing deriving support from prostitution "plainly states that the conduct prohibited by that statute is

the sharing of proceeds earned by a known prostitute. In contrast, under [the human trafficking statute], an individual who knowingly enables or causes another person to engage in commercial sexual activity need not benefit, either financially or by receiving something of value, from such conduct." McGhee, 472 Mass. at 416-417. Additionally, the knowledge element of the deriving support statute is retrospective, because the crime occurs when proceeds of a past act of prostitution are shared, while the knowledge required by the human trafficking statute is prospective, as it relates to an individual's "anticipated engagement in commercial sexual activity." Id. at 417.

Moreover, the plain and ordinary meaning of the actus reus in the human trafficking statute does not, as the defendant contends, necessarily "connote[] some level of inducement, manipulation, or coercion." For example, the dictionary definition of "entice" is to "incite," "instigate," "draw on by arousing hope or desire," "allure," "attract," "draw into evil ways," "lead astray," or "tempt." Webster's Third New International Dictionary 757 (1993). See Commonwealth v. Samuel S., 476 Mass. 497, 501 (2017) (we look to dictionary definitions as guide to plain or ordinary meaning of term). None of these meanings implies force or coercion. One may entice, for example, simply by making an attractive offer. Similarly, to "recruit" means to "hire or otherwise obtain to perform

services," to "secure the services of" another, to "muster," "raise," or "enlist." Webster's Third New International Dictionary 1899 (1993). Such recruitment does not require force or coercion.

In the same vein, nothing in the language of the human trafficking statute suggests that it excludes conduct aimed at victims who have engaged in prostitution in the past. An individual who previously has worked as a prostitute nonetheless might decide to engage in a particular act of prostitution. As the Commonwealth points out, the reading that the defendant would impose would lead to an absurd result, as the statute would then punish only "the first person who victimizes a person via sexual servitude." The fact that, in this case, the victim had been engaged in prostitution during some unspecified period before she met the defendant does not insulate him. Evidence introduced at trial showed that the victim returned to prostitution following the defendant's specific encouragement. Thus, the evidence was sufficient to support his conviction on the charge of human trafficking.

c. Jury instruction on human trafficking. The defendant contends that the judge's instruction on human trafficking was inadequate. On this charge, the judge instructed:

> "In order to prove the defendant guilty of this offense, the Commonwealth must prove the following two elements beyond a reasonable doubt: first, that the

> defendant subjected or attempted to subject, or
> recruited or enticed, harbored, transported, provided
> or obtained by any means, or attempted to recruit,
> entice, harbor, transport, provide or obtain by any
> means, [the victim], or caused [the victim] to engage
> in commercial sexual activity; and second, that the
> defendant did so knowingly."

We discern no error in the judge's instruction. The defendant takes issue with the judge's rejection of his proposal to include language stating that the defendant must have "enabled or caused" the victim's prostitution. This argument relies on language in McGhee intended to clarify that the human trafficking statute "does not prohibit all interactions or associations between a prostitute and family members, friends, or social service organizations. Rather, it forbids such individuals or entities from knowingly undertaking specified activities that will enable or cause another person to engage in commercial sexual activity." McGhee, 472 Mass. at 418. This reference to "enabling" or "causing" prostitution was a short-hand means of describing the various ways in which a person may violate the human trafficking statute, as set forth in full in the judge's instruction.

The defendant argues also that the judge erred in declining to give a proposed instruction that "[i]t is not enough to show that [the victim] worked as a prostitute and the defendant helped her do so; the Commonwealth must prove that he knowingly did at least one of the specific things listed above to make her

engage in commercial sexual activity." The proposed instruction is duplicative of the judge's instruction, and merely requires the jury to consider all of the elements of the human trafficking statute. That the judge declined to emphasize the elements of the human trafficking statute in the manner that the defendant preferred does not constitute error. See Commonwealth v. Kelly, 470 Mass. 682, 688 (2015) ("Trial judges have considerable discretion in framing jury instructions, both in determining the precise phraseology used and the appropriate degree of elaboration" [quotations and citation omitted]).

d. Impeachment evidence. The defendant argues that it was reversible error for the judge to bar him from using Backpage records to impeach the victim's testimony. Prior to trial, the parties had stipulated to the authenticity of a number of Backpage records;[13] these records included four Backpage advertisements depicting the victim, as well as invoices associated with those advertisements. Four of the invoices, one for each of the four advertisements, were dated for periods prior to the defendant's arrest. Twenty other invoices,

---

[13] The stipulation provided: "The parties stipulate that the Backpage records of [the victim] are true, authentic, and complete. The parties waive objections to admittance of these records on authenticity grounds and state that they need not be obtained via a trial subpoena for admission at trial. The parties do not waive objections to admissibility on any other grounds."

associated with one of these advertisements, were dated after the defendant had been arrested and was being held in pretrial detention.

The Commonwealth moved in limine to exclude evidence of Backpage invoices after the date of the defendant's arrest, arguing that those invoices had no bearing on the human trafficking charge and that evidence of any of the victim's subsequent sexual conduct would violate the rape shield statute. The judge denied the Commonwealth's motion, reasoning that such evidence would be relevant to the issue whether the victim was "enticed" into prostitution. The judge also ruled that defense counsel would be allowed to ask the victim whether she had reposted an advertisement on Backpage after the defendant's arrest.

On direct examination of the victim, the Commonwealth was allowed to admit the package of documents containing all of the Backpage advertisements and invoices, "[s]ubject to redaction." During cross-examination, the victim denied that she had reposted any advertisements on Backpage after the defendant was arrested. Defense counsel believed that she was perjuring herself and sought to impeach her denial with the Backpage invoices from the period after the defendant's arrest. He argued that the invoices showed that someone must have paid to have the advertisement reposted, and that the invoices had not

been generated automatically, because they were dated sporadically and depicted an "auto repost" box which was not checked.  He also maintained that the person who had reposted the advertisement likely was the victim, because the advertisement associated with the postarrest invoices displayed a telephone number that the victim had obtained only after the defendant had asked her to stop using Backpage, shortly before his arrest.  Additionally, the invoices dated after the defendant's arrest had a different electronic mail address from that on the invoices dated before his arrest, and the new electronic mail address contained the victim's married name.

The judge denied defense counsel's request, noting that counsel could not impeach the victim with someone else's statement, and would need to call a Backpage employee to explain the contents of the invoices.  She commented that the Backpage invoices were "speculative at best" on the question whether, as the defendant argued, the victim had reposted the advertisement. The judge observed that the victim was not required to "figure them out herself," and noted that the defendant should have called a Backpage employee to explain the contents of the invoices in order to contradict the victim's testimony; simply "dangling a series of invoices in front of [the jury]" was

unfair.[14]  While defense counsel was permitted to ask about the victim's reposting of the advertisement, the judge explained, he would be "stuck with her answer."  The judge then sua sponte told the parties retroactively to redact the previously admitted Backpage records in conformity with her ruling.

A witness generally may be impeached by contradiction with (1) the witness's own prior, inconsistent statement; (2) internal inconsistency in the witness's testimony; or (3) other conflicting evidence.  M.S. Brodin & M. Avery, Handbook of Massachusetts Evidence § 6.13 (2017).  See Mass. G. Evid. §§ 606, 613(a) (2017).  Because the invoices did not constitute statements by the victim, they could not be treated as her prior

---

[14] The judge determined further that admission of the Backpage invoices from the time after the defendant's arrest would violate G. L. c. 233, § 21B, the rape shield statue.  With a few exceptions, that statute generally restricts the admissibility of evidence of "the reputation of a victim's sexual conduct" and "specific instances of a victim's sexual conduct."  We have recognized, however, that a "defendant may introduce evidence of the complaining witness's sexual conduct where that conduct is relevant to the complainant's bias or motive to fabricate."  Commonwealth v. Harris, 443 Mass. 714, 721 (2005).  See Commonwealth v. Polk, 462 Mass. 23, 37-38 (2012) ("where the rape shield statute is in conflict with a defendant's constitutional right to present evidence that might lead the jury to find that a Commonwealth witness is lying or otherwise unreliable, the statutory prohibition must give way to the constitutional right").  When offered for impeachment, the introduction of such evidence is within the discretion of the trial judge, bearing in mind "the important policies underlying the [r]ape-[s]hield statute" (citation omitted).  Harris, supra. Given our conclusion, we do not address whether the rape shield law would have precluded introduction of the invoices.

inconsistent statements for impeachment purposes. See Commonwealth v. Evans, 438 Mass. 142, 157 (2002), cert. denied, 538 U.S. 966 (2003) (memorandum could not be used to impeach witness with prior inconsistent statement because "the statement, as written, was not attributable to the [witness] with sufficient precision to be used for the intended purpose"). Additionally, while the invoices could constitute independent contradictory evidence, a judge "has discretion to exclude relevant evidence on the ground that its probative value is outweighed by the risk of confusion or unfair prejudice." Commonwealth v. Rosario, 444 Mass. 550, 557 (2005). Although the parties did stipulate to the authenticity of the records, the judge did not preclude their use for impeachment purposes on authenticity grounds. Rather, she concluded that the invoices would be too confusing for the jury to make sense of without the testimony of a Backpage employee who could explain how Backpage issued its invoices, and other of its record-keeping practices, such that the meaning of the unchecked box on the invoices, and whether it necessarily meant a manual intervention by the person who posted the advertisement, was clear.

The defendant points out, accurately, that a witness who perjures himself or herself opens the door to rebuttal of the false statements. See Commonwealth v. Roderick, 429 Mass. 271, 275 (1999). Nevertheless, impeachment is not a "blank check,"

and is limited by other rules of evidence.  See <u>Commonwealth</u> v. <u>Durand</u>, 475 Mass. 657, 662, (2016), cert. denied, 138 S. Ct. 259 (2017) ("trial judges retain wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues or interrogation that is repetitive or only marginally relevant" [citation and alterations omitted]).  The trial judge was best situated to assess the extent to which the invoices might have been confusing to the jury.  See <u>L.L.</u>, 470 Mass. at 185 n.27. We conclude that her ruling was not an abuse of discretion.

<u>Judgments affirmed</u>.