NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-844

COMMONWEALTH

vs.

ADRIAN HINDS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury found the defendant, Adrian Hinds, guilty of assault and battery by means of a dangerous weapon on two victims, Miranda Arthur-Smith and Nathaniel Cherniak. On appeal, the defendant claims that a text message and two Facebook posts were erroneously admitted at trial and that he was deprived of his constitutional right to present a defense. Because the Facebook posts were improperly admitted, the defendant was unfairly deprived of the opportunity to present expert testimony to challenge the posts' authenticity, and these errors were prejudicial, we reverse.

Background. The procedural history of this case is set forth in Commonwealth v. Hinds, 487 Mass. 212, 213 & n.1, 217 (2021). The evidence at the defendant's second trial was largely the same as that at the first trial, see id. at 214-216,

with three prominent differences:  the admission of the expert testimony of Sophie Bjork-James, see id. at 223-224; of Arthur-Smith's statement, "Even if you seen that, how the fuck could you prove it?," see id. at 233-234; and of the text message and Facebook posts discussed in detail herein.  As at the first trial, the case turned on the credibility of the defendant, Cherniak, and Arthur-Smith.  See id. at 216, 229.

Discussion.  1.  Text message and Facebook posts.  The defendant argues that the admission of a text message and two Facebook posts extracted from his cell phone amounted to an abuse of discretion requiring reversal.

The text message was sent from the defendant's phone to an unidentified third party nine months before the incident.  The body of the message read as follows:

> "Death to those in 65  miranda and nate will work work under false names they will die along with those who abuse their power and feed off suffering."

The Facebook posts, also extracted from the defendant's phone, were associated with a Facebook account under the username of "Adrian Anomaly Hinds."  The first post was dated six months before the incident and stated,

> "the half chink and Hispanic transgender punk (occupant of 66) as well as the brujeria store owner (occupant of 68) are getting scared all your loteria and san muerte and portugese bullshit witchcraft aint doing shit"

2

The second one, posted about four months before the incident, said,

"as soon as you leave the little meth head chink in 66 leaves"

Prior to trial the defendant filed a motion in limine to exclude the text message and Facebook posts on the grounds that they were not authenticated and that, in any event, they were more prejudicial than probative. The judge initially excluded them, without addressing the authentication issue. With respect to the Facebook posts, the judge stated that Cherniak's ethnicity had no relevance to the case and was irrelevant in determining whether Cherniak had "white supremacist tendencies." Although the posts showed the defendant's "obvious animosity towards the occupants of 66 and 68," the judge stated, their prejudicial effect outweighed their probative value "too greatly." While excluding the statements as substantive evidence, the judge stated that if the defendant took the stand and testified that "he never harbored any negative feelings towards Mr. Cherniak, they may become admissible for purposes of impeachment." The judge likewise excluded the text message (and other text messages extracted from the phone) because "their probative value may be significant but their prejudicial effect greatly outweighs it. And they predate the incident by a number of months." Again the judge recognized that the text messages

may have impeachment value, stating "these are out" unless the defendant testified "that he had no negative feelings towards Mr. Cherniak."

The defendant did elect to testify, and on cross-examination the prosecutor asked whether he had any negative feelings toward Cherniak. The defendant responded, "Yes." He explained, "After [Cherniak] asked me to sell drugs with him and made the racist comment, that I must be selling drugs to afford my Porsche, I felt very angered by that. That's a negative feeling, is it not?" The cross-examination continued,

Q.: "And did you ever make any racial slurs towards him?"

A.: "No, I never said anything racial to him."

Q.: "Did you ever post anything negative about him?" [Defendant's objection overruled]

A.: "No."

The prosecutor also questioned the defendant about his Facebook accounts. The defendant testified that his personal Facebook account was under the name "Black Clark Kent," but that there were "multiple Facebook pages made of [him]" because he was a musician. He admitted that he sometimes went by the name Adrian Anomaly Hinds, and that the Facebook account under that name included a picture of him, but he insisted that he did not post the picture and that the account was not his.

4

After the defense rested, the Commonwealth recalled Westfield Police Patrolman Detective Todd Edwards, who had previously testified about extracting a photograph from the defendant's cell phone, to testify that he had also extracted the text message and Facebook posts. When the Commonwealth attempted to admit the text message, the defendant objected that it was "not a rebuttal" of the defendant's testimony because he had admitted having negative feelings about the victims. The judge nonetheless reversed his previous ruling and overruled the objection with no explanation except that the Commonwealth had agreed to redact other text messages on the same page of the extraction. The judge then admitted the Facebook posts over the defendant's objections, including that he was not the author of the posts, finding that although they were "very prejudicial," they were also "very probative," and that "it's not more prejudicial than probative, because it is so probative, given [the defendant's] testimony."

a. <u>Admissibility of text message</u>. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Mass. G. Evid. § 401(a) (2023). Even if evidence is relevant, a judge should exclude it "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Mass. G. Evid. § 403 (2023). See

5

Commonwealth v. Crayton, 470 Mass. 228, 249 & n.27 (2014).[1]

"Evidentiary rulings on relevance, probative value, and prejudice are left to the sound discretion of the trial judge." Commonwealth v. MacCormack, 491 Mass. 848, 863 (2023). A judge's evidentiary rulings are reviewed for abuse of discretion and "will be upheld unless the judge made a clear error of judgment, such that the decision falls outside the range of reasonable alternatives." Id. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Our evaluation of the judge's evidentiary rulings does not hinge on the fact that he changed his mind about the admissibility of the evidence midtrial, see MacCormack, 491 Mass. at 864 (no abuse of discretion where judge reversed initial ruling as evidence developed), or that he permitted the Commonwealth to introduce the evidence on rebuttal, see

---

[1] Arguably, the text message and Facebook posts, which depicted the defendant as having threatened the victims in the past using racial, ethnic, and other slurs, and as generally being hostile and erratic, "should have been analyzed as prior bad act evidence potentially admissible for a nonpropensity purpose." Commonwealth v. Correia, 492 Mass. 220, 227 (2023) (discussing admissibility of rap lyrics written by defendant referencing violence, gangs, and guns). The text message and Facebook posts reflected badly on the defendant's character and created a risk that the jury would impermissibly infer that he had a bad character or propensity to commit the crimes charged. See id. at 229. "[E]ven if offered for a permissible purpose, bad act evidence nevertheless is inadmissible where 'its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk.' Mass. G. Evid. § 404(b)(2)." Id. at 228-229.

6

Commonwealth v. Roberts, 433 Mass. 45, 51 (2000) (judge has nearly unreversible discretion to permit rebuttal testimony). Nor is there any per se rule requiring reversal if a judge makes a ruling based on a "misapprehension" of the defendant's testimony.[2]  That said, we do consider the judge's prior rulings and explanations for changing his mind in assessing the reasonableness of his exercise of discretion.

We discern no abuse of discretion in the judge's ultimate decision that the text message was relevant and more probative than prejudicial.  The text message, which referred to Arthur-Smith and Cherniak by name and said "they will die," went to the central issues in the case:  the defendant's intent to do them harm and the veracity of his version of the events.[3]  See Commonwealth v. Butler, 445 Mass. 568, 575-576 (2005) (bad act evidence admissible to show "hostile nature" of relationship and

---

[2] The single case on which the defendant relies for his "misapprehension of defendant's testimony" argument, People v. Reagan, 374 N.Y.S.2d 33, 33-34 (2d Dep't 1975), has no persuasive value.  It is a five-sentence memorandum of decision, based on "the circumstances of this case," which are not discussed, and cites no authority whatsoever for this proposition.  Likewise, the defendant's argument that the judge violated his due process rights by changing his ruling cites no legal authority and does not rise to the level of appellate argument.  See Commonwealth v. Savageau, 42 Mass. App. Ct. 518, 522 n.4 (1997); Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

[3] The jury could also reasonably infer that the statement, "Death to those in 65," referred to Arthur-Smith and Cherniak, even though the apartment number was off by one.

7

"continuing animosity on the defendant's part" toward victim). Although the judge's initial decision to exclude the text message was based in part on its remoteness in time, after hearing Cherniak testify about the nature of his relationship with the defendant, which began around the date of the text message, and the defendant testify that he had initially been friendly with Cherniak, the judge could have reasonably determined that the hostile text message nine months prior to the incident was relevant to paint a full picture of the relationship. Although the judge initially stated that the text message might be admissible to impeach the defendant's credibility if he denied having negative feelings about Cherniak, which the defendant did not do, it was within the judge's discretion to reconsider the initial ruling and determine that the text message had probative value for purposes other than impeachment.

Nor did the judge abuse his discretion in determining that the probative value of the text message outweighed any unfair prejudice. "[I]n balancing the probative value against the risk of prejudice, the fact that evidence goes to a central issue in the case tips the balance in favor of admission." Commonwealth v. Jaime, 433 Mass. 575, 579 (2001). Moreover, the judge could have reasonably determined that the risk of unfair prejudice was minimized after the Commonwealth agreed to redact other

incendiary text messages from the extraction report.  Although the judge should have articulated his weighing of the text message's probative value against its prejudicial effect more clearly on the record, "the judge's failure to do so is not fatal."  Commonwealth v. Samia, 492 Mass. 135, 148 (2023).

b.  Admissibility of Facebook posts.  The admission of the Facebook posts is more problematic.  Setting aside the question of authenticity, although the Facebook posts exhibited some generalized animosity toward Arthur-Smith and Cherniak, the admission of racial epithets in evidence requires particular scrutiny because it "poses a risk of inflaming a jury's emotions."  Commonwealth v. Bishop, 461 Mass. 586, 596 (2012).  Thus, "[t]he most significant factor in determining whether racial references are improper is the extent to which they have probative value with respect to the issues at trial."  Commonwealth v. Washington, 28 Mass. App. Ct. 271, 273 (1990).

The posts had little probative value.  As the judge initially ruled, Cherniak's ethnicity had nothing to do with any triable issue, and this remained true up to the time the Facebook posts were admitted.  Nor was Arthur-Smith's ethnicity or gender identity an issue.  Nonetheless, the judge ruled that the Facebook posts had become "very probative" in light of the defendant's testimony.  The judge did not explain what aspect of the defendant's testimony had made the Facebook posts "so

probative."  As with the text message, however, he had previously stated that he would consider admitting the Facebook posts for impeachment purposes if the defendant testified that "he never harbored any negative feelings towards Mr. Cherniak."  Because the defendant did admit that he harbored negative feelings, the posts could not be used to impeach this aspect of his testimony.  Likewise, because there was no evidence that the Facebook posts were directed toward or seen by Cherniak, they could not be used to impeach the defendant's testimony that he "never said anything racial to him."  The only aspect of the defendant's testimony that the posts contradicted was his denial of "ever post[ing] anything negative" about Cherniak, an issue far removed from the charges against the defendant.

"[A] judge, in his discretion, may permit impeachment by extrinsic evidence even on collateral points."  Simon v. Solomon, 385 Mass. 91, 107 (1982).  "Nevertheless, impeachment is not a 'blank check,' and is limited by other rules of evidence."  Commonwealth v. Dabney, 478 Mass. 839, 860 (2018).  See Commonwealth v. Durand, 475 Mass. 657, 662 (2016), cert. denied, 138 S. Ct. 259 (2017).  "If rebuttal testimony also bears on the defendant's character, thereby raising the danger of unfair prejudice, the better practice is to exclude such evidence if offered solely as impeachment on a collateral matter."  Commonwealth v. Ferguson, 425 Mass. 349, 355 n.6

10

(1997).  Moreover, "evidence that poses a risk of unfair prejudice need not always be admitted simply because [it is admissible]; the judge still needs to weigh the probative value of the evidence and the risk of unfair prejudice, and determine whether the balance favors admission."  Commonwealth v. Gray, 463 Mass. 731, 753 (2012), quoting Commonwealth v. McCowen, 458 Mass. 461, 479 n.15 (2010).

We conclude that the judge made a clear error of judgment in admitting the Facebook posts.  Assuming the defendant was the author of the posts, the fact that he referred to Arthur-Smith and Cherniak pejoratively, including the use of racial and ethnic slurs, was powerful evidence of the defendant's bad character, but weak evidence for any permissible purpose.  In determining whether there was an abuse of discretion, we consider whether the judge took "care to avoid exposing the jury unnecessarily to . . . material that might inflame [their] emotions and possibly deprive the defendant of an impartial jury."  Commonwealth v. Berry, 420 Mass. 95, 109 (1995).  Here, the record does not reflect a "thoughtful weighing of the risks of unfair prejudice," Commonwealth v. Peno, 485 Mass. 378, 394 (2020), nor were contemporaneous limiting instructions given to limit such risks, see id. at 396.

2.  Exclusion of expert testimony.  After the Facebook posts were admitted in the Commonwealth's case on rebuttal, the

11

defendant sought to put on his own expert, Lindsay Hawk, to challenge the implication from Edwards's testimony that because that the Facebook posts were extracted from the defendant's phone, he must have authored the posts. Hawk's testimony, if credited, would have supported the defendant's testimony in which he denied having posted anything negative about Cherniak. The judge excluded the expert testimony primarily on the ground that Hawk was not disclosed as a witness prior to trial, but also because he thought it "clear" that the author of the posts was "somebody with knowledge of the ethnicity of the occupant of [apartment sixty-six]."[4]

"The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a defendant's right to present a defense." Commonwealth v. Dagenais, 437 Mass. 832, 839 (2002). However, "[i]n the face of 'legitimate demands of the adversarial system,' this right may be tempered according to the discretion of the trial judge." Commonwealth v. Carroll, 439 Mass. 547, 552 (2003), quoting

---

[4] The defendant's authorship was necessary to establish the authenticity, and hence the admissibility, of the Facebook posts. See Commonwealth v. Meola, 95 Mass. App. Ct. 303, 308-309 (2019); Mass. G. Evid. § 901 note (2023). Although the content of the posts, together with Edwards's testimony, was sufficient to permit the jury to find by a preponderance of the evidence that the defendant was the author, this determination was ultimately for the jury to make. See Meola, supra at 308 n.13, 309.

12

_Commonwealth_ v. _Edgerly_, 372 Mass. 337, 343 (1977). We review for abuse of discretion the judge's balancing of the need for an orderly trial against the defendant's right to present evidence. See _Commonwealth_ v. _Paiva_, 71 Mass. App. Ct. 411, 414 (2008). "[F]actors which must be taken into account in assessing such a balance . . . include: (1) prevention of surprise; (2) evidence of bad faith in the violation of the conference report; (3) prejudice to the other party caused by the testimony; (4) the effectiveness of less severe sanctions; and (5) the materiality of the testimony to the outcome of the case." _Id._, quoting _Commonwealth_ v. _Durning_, 406 Mass. 485, 496 (1990). Moreover, "the preclusive sanction should be reserved for 'hard core transgressions,'" _Commonwealth_ v. _Dranka_, 46 Mass. App. Ct. 38, 42 (1998), quoting _Chappee_ v. _Vose_, 843 F.2d 25, 31 (1st Cir. 1988), where the defendant's failure to comply is "deliberate and prejudicial to the Commonwealth." _Dranka_, _supra_, quoting Reporters' Notes to Mass. R. Crim. P. 14 (c) (2), Mass. Ann. Laws, Rules of Criminal Procedure 168 (Lexis 1977). See _Hinds_, 487 Mass. at 229 n.29.

The judge did not address any of the _Durning_ factors, all of which weighed in favor of allowing the defendant's expert to testify. There was no surprise or prejudice to the Commonwealth. This was the second trial, and Hawk was known to the Commonwealth, having testified at a motion hearing prior to

13

the first trial.  The Commonwealth had its own witness, Edwards, who was familiar with the provenance of the Facebook posts.  The record does not show, and the judge did not find, any bad faith on the part of defense counsel.  Indeed, the Facebook posts were excluded at the first trial, and while defense counsel might have anticipated the issue of their authenticity arising at the second trial, nothing in the record suggests that she left Hawk off the witness list to gain an unfair advantage.  Although the judge may have reached a conclusion about the authorship of the posts, the issue of authenticity was for the jury to decide, see note 4, supra, and Hawk's testimony may have been material their consideration of the matter.

3.  Prejudice.  Having determined that the judge abused his discretion by admitting the Facebook posts in evidence and depriving the defendant of the opportunity to rebut their authenticity,[5] we must determine whether the defendant was prejudiced.  "An error is not prejudicial if it did not influence the jury, or had but very slight effect" (quotation and citation omitted).  Commonwealth v. Kelly, 470 Mass. 682, 688 (2015).  A combination of errors may require reversal even where no single error is sufficiently prejudicial to require

---

[5] The defendant argues that his ability to rebut the Facebook posts was further stymied because the judge improperly prevented him from testifying in surrebuttal.  Given our disposition of the case, we need not address this additional argument.

14

reversal.  See Commonwealth v. Cancel, 394 Mass. 567, 576 (1985).  We conclude that the defendant was prejudiced.

The case turned on the defendant's credibility, and the Facebook posts, which were inflammatory evidence of his bad character, may have swayed the jury's evaluation of his testimony.  "[T]rial judges must take care to avoid exposing the jury unnecessarily to inflammatory material that might inflame the jurors' emotions and possibly deprive the defendant of an impartial jury."  Berry, 420 Mass. at 109.  The preclusion of the defendant's expert deprived him of an avenue of rehabilitating both his credibility and his character.  The risk of prejudice is high where "[t]he errors all concern evidence implicating credibility in a trial in which credibility was the only real issue."  Commonwealth v. Mazzone, 55 Mass. App. Ct. 345, 353 (2002).  See also Commonwealth v. Dion, 30 Mass. App. Ct. 406, 415 (1991) (errors in combination required reversal where "[t]he case was . . . one of word against word").

Because the jury were improperly exposed to matters that created the risk of unfair prejudice, and the defendant was

15

deprived of an opportunity to rebut, we cannot say with fair assurance that the errors did not affect the verdict.

Judgments reversed.

Verdicts set aside.

By the Court (Milkey,
Massing & Henry, JJ.[6]),

*Joseph F. Stanton*

Clerk

Entered:  August 8, 2023.

---

[6] The panelists are listed in order of seniority.