NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12167

COMMONWEALTH  vs.  PETER BIN.


Middlesex.      May 11, 2018. - October 9, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Joint Enterprise.  Felony-Murder Rule.  Robbery.
    Armed Home Invasion.  Cellular Telephone.  Evidence, Joint
    venturer, Business record.  Practice, Criminal, Question by
    jury, Instructions to jury, Verdict.



    Indictments found and returned in the Superior Court
Department on December 6, 2012.

    The cases were tried before Kathe M. Tuttman, J.


    Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
    Jamie M. Charles, Assistant District Attorney (David M.
Solet also present) for the Commonwealth.


    GAZIANO, J.  A Superior Court jury convicted the defendant

of murder in the first degree, as a joint venturer, in the

shooting death of Quintin Koehler on July 7, 2012, at his

grandmother's house in Billerica.  The Commonwealth proceeded on

a theory of felony-murder, with armed home invasion and

attempted armed robbery as the predicate felonies.  At trial,
the Commonwealth argued that the defendant was one of four
intruders who entered the victim's home intending to rob him of
drugs and money, a struggle ensued, one of the other men fatally
shot the victim, and all four intruders fled from the scene
together with two others, who had remained in their vehicles.[1]

In this direct appeal, the defendant challenges the
sufficiency of the evidence that he was present at the scene,
knew that any of the alleged accomplices were armed, or shared
any intent to commit either the armed home invasion or the
robbery.  The defendant argues also that cell site location
information (CSLI) evidence was introduced through an
unqualified witness and should have been excluded.  In addition,
the defendant maintains that the judge erred when, in response
to a jury question, she did not instruct the jury, as defense
counsel requested, that they were allowed to reach factually
inconsistent verdicts.  Finally, the defendant asks this court
to abolish the felony-murder rule, and also asks us to use our

---

[1] The defendant was tried with a single codefendant, Gabriel
Arias, the only one of the six alleged participants at the scene
who had not then been indicted on a charge of murder in the
first degree.  Arias was convicted of the sole offense of which
he was indicted, intentionally misleading a police officer, in
violation of G. L. c. 268, § 13B.  In 2017, while he was serving
a prison term of from five to seven years on that offense, Arias
was indicted on charges of murder in the first degree, armed
home invasion, and conspiracy for his alleged role in this case;
his trial on those indictments is pending.

extraordinary power under G. L. c. 278, § 33E, to reduce the verdict of murder or to order a new trial.  For the reasons that follow, we affirm the convictions and decline to exercise our authority to grant relief under G. L. c. 278, § 33E.[2]

1.  Facts.  We recite the facts that the jury could have found, viewed in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979), reserving some facts for later discussion of particular issues.

The victim, Quintin Koehler, lived in Billerica in his grandmother's house.  He worked in landscaping, and also sold marijuana and other drugs from the house.  He had a roommate who was his partner in both enterprises.

---

[2] In addition to murder in the first degree, the defendant was indicted on a charge of armed home invasion against Ryan Koehler and a charge of attempted armed robbery of Quintin Koehler.  In her final charge, the judge instructed the jury that the charge of attempted armed robbery applied to Quintin Koehler, and instructed on armed home invasion without specifying a victim.  The defendant was convicted of both felonies.  He was acquitted of charges of carrying a firearm without a license and possession of ammunition without a firearm identification card.  At sentencing, the convictions of armed home invasion and attempted armed robbery were vacated as duplicative.  See Commonwealth v. Carter, 475 Mass. 512, 513-514 (2016), citing Commonwealth v. Alcequiecz, 465 Mass. 557, 558 (2013).  Shortly thereafter, on the Commonwealth's motion, both felony convictions were reinstated.  While reinstatement of the conviction of armed home invasion, as to Ryan Koehler, was appropriate, the conviction of attempted armed robbery of Quintin Koehler properly should have been vacated as duplicative.  See Commonwealth v. Rivera, 464 Mass. 56, 81-82, cert. denied, 570 U.S. 907 (2013), citing Commonwealth v. Rasmusen, 444 Mass. 657, 666-667 (2005) (where felony-murder conviction is based on more than one felony, only one of underlying felonies is duplicative).

In March, 2012, the victim and his roommate began purchasing marijuana from Ashley Marshall, at a music studio in Lynn.[3] They purchased marijuana in one- to four-pound increments and subsequently resold it in smaller quantities. The roommate would coordinate purchases with Marshall through text messages, using coded language to establish the quantity and price of a purchase. At one meeting at the music studio, the victim and his roommate saw a tall man with a shaved head who had a number of tattoos, including one on the back of his head that read, "LYNN, MASS."[4]

In June, 2012, one of Marshall's friends, Adam Bradley, told her that he needed someone to rob, and inquired about the possibility of robbing the victim and his roommate. At first, Marshall declined to help Bradley because the victim and his roommate were friends of her cousin. On July 6, 2012, Bradley came to the music studio and reiterated that he wanted to rob the victim and his roommate. After initially refusing, Marshall agreed to help. Around 5 P.M., Marshall sent the victim's roommate several text messages asking if he wanted to purchase marijuana. She was attempting to ascertain whether the roommate

---

[3] Ashley Marshall testified at trial under a grant of immunity.

[4] The Commonwealth introduced a booking photograph of Adam Bradley that showed a tattoo on the back of his head which reads, "LYNN, MASS." Marshall also testified that Bradley had such a tattoo.

had cash in the house.[5]  The roommate, who had had reservations about dealing with Marshall and had not made any recent purchases from her, did not respond.

Marshall used an Internet Web site to direct Bradley to the victim's house.  She also drew a layout of the inside of the house on a piece of notebook paper.  Before leaving, Bradley asked Marshall if he needed to bring weapons; Marshall said that he did not, because the victim and his roommate were "little kids" who would not offer any resistance.  Bradley returned to the studio later that evening and made a number of telephone calls.  Shortly thereafter, approximately twenty Asian men arrived at the studio.  Before they left, Bradley showed them the Web site with directions to the victim's house.  After telephoning Marshall repeatedly throughout the night of July 6 to July 7, 2012, Bradley arrived at the music studio on the morning of July 7, 2012; Marshall testified that he appeared to be "frantic."

The Commonwealth's theory at trial was that Bradley was assisted in the attempted armed robbery by the defendant, Steven Touch, Jason Estabrook, Gabriel Arias, and Sophan Keo.[6]  The

---

[5] A search of the victim's house after his death revealed a large quantity of cash and marijuana.

[6] Evidence at trial suggested that the defendant, Bradley, Touch, Arias, and Keo were associated with the Bloods gang in Lynn.  The judge instructed the jury that they were not to

victim's brother, Ryan Koehler,[7] who had been present at the scene and had attempted to force the armed intruders out of the house in the minutes before his brother was shot, described some of the assailants in detail, but was able to give only a vague description of others.  Forensic evidence at the scene, medical records, and statements by Marshall tied some of the men to the scene.  As evidence of the joint enterprise involving all of the men, the Commonwealth relied heavily on surveillance video footage of two white automobiles that seemed to be acting in concert for approximately one hour before, and immediately after, the shooting, and extensive evidence of cellular telephone calls among the men, as well as CSLI showing a pattern of movement of all of their cellular telephones toward and away from the victim's Billerica home at the time of the shooting.

Keo owned a white Honda Civic with distinctive blue after-market headlights.  Touch regularly used his girl friend's white Toyota Corolla with her permission.

---

consider the evidence "to infer anything about [the] defendant's character or general propensity to commit a crime.  The only purpose for which any evidence concerning alleged gang affiliation may be considered by . . . the jury is on the limited issue of what the Commonwealth claims may have been a particular defendant's state of mind at a particular time either to form a motive for the offenses charged in this case, or to participate in a joint venture or criminal enterprise."

[7] Because they share a last name, we refer to the victim's brother, Ryan Koehler, by his first name.

At 2:51 A.M. on July 7, 2012, an officer of the Billerica police department, who was on routine patrol, entered the license plate of Keo's vehicle in the police computer system. Surveillance footage taken by a camera at a Billerica convenience store on Route 3A, near the victim's home, shows that at 3:19 A.M. and 3:33 A.M., a Honda Civic drove past the store. At 3:25 A.M. and 3:33 A.M., a Toyota Corolla drove past the store. At 3:38 A.M., both vehicles entered a parking lot across the street from the convenience store, in view of the surveillance camera, and each vehicle extinguished its lights. At 3:40 A.M., both vehicles' lights were turned on, and they left the parking lot eleven seconds apart.

During this time, there were repeated calls among cellular telephones registered to, or used by, the defendant and the other five men; although none of the alleged accomplices lived in Billerica, the calls connected to towers in the Billerica area, heading toward the victim's house. Evidence of the cell towers that were accessed, the times and duration of the calls, and the locations of the cell towers on a map relative to the victim's house was introduced by a State police trooper who was a member of its technical surveillance unit, as well as a member of the Federal Bureau of Investigation's cellular analysis survey team.

According to the CSLI records, a telephone registered to the defendant traveled from Revere to Billerica during the period immediately prior to the shooting. On July 7, 2012, the defendant's cellular telephone activated a cellular tower in Revere at 1:41 $\underline{A}.\underline{M}.$, a cellular tower in Burlington at 2:43 $\underline{A}.\underline{M}.$ and 2:45 $\underline{A}.\underline{M}.$, and a cellular tower in Billerica at 2:46 $\underline{A}.\underline{M}.$, 2:47 $\underline{A}.\underline{M}.$, 3:34 $\underline{A}.\underline{M}.$, 3:37 $\underline{A}.\underline{M}.$, 3:38 $\underline{A}.\underline{M}.$, 3:44 $\underline{A}.\underline{M}.$, and 3:46 $\underline{A}.\underline{M}.$ A cellular telephone associated with Bradley activated a cellular tower in Lynn at 1:14 $\underline{A}.\underline{M}$, a cellular tower near Wakefield at 2:31 $\underline{A}.\underline{M}$, and a cellular tower in Bedford at 3:50 $\underline{A}.\underline{M}.$[8] Between 1:33 $\underline{A}.\underline{M}.$ and 3:37 $\underline{A}.\underline{M}.$, the defendant's telephone connected with Keo's telephone three times. During the early morning hours of July 7, it also connected with a telephone associated with Touch five times, and received two text messages from that number,[9] and connected with Arias's telephone four times.

At approximately 3:50 $\underline{A}.\underline{M}.$ on July 7, 2012, the victim and his brother, Ryan, were watching a movie in the victim's bedroom when they heard loud noises from the kitchen. The brothers ran into the kitchen to investigate and discovered three men, each

---

[8] The telephone number was registered to JMB Construction, a company owned by Jane and Michael Bradley. The address of JMB Construction address was the same as the address on Adam Bradley's driver's license.

[9] This cellular telephone number was registered to Christina Danh, who testified that she paid for Touch's telephone service.

with a firearm, standing near the door. Ryan described one man as being blonde with blue eyes, wearing a grey bandana and a hat, and holding a semiautomatic weapon.[10]  Ryan testified at trial that he was focused on this man as he entered the kitchen, following his brother, because the man was pointing the weapon at him.  Ryan was able to describe the other two men only as wearing dark clothing; he said that he did not know their height, age, or race.[11]  The first man told the victim to "get down on the ground."  The victim responded that the men should "take the fake ass BB guns and . . . shove them up their candy ass and get the fuck out of the house."  The blonde intruder then racked the firearm.[12]  The victim instructed Ryan to get a sword from the victim's bedroom.  Before Ryan could do so, the victim armed himself with a tea kettle from the top of the stove, and Ryan grabbed a frying pan.

Ryan then noticed a fourth man, who was larger and heavier, wearing a red T-shirt, black shorts with a blue stripe, and

---

[10] The Commonwealth introduced evidence from a social media Web site that contained an image of Bradley wearing a grey bandana.

[11] On cross-examination, after his memory was refreshed by reviewing his grand jury testimony, Ryan testified that he had said at that time that the third man was "white" and had dark hair, but that he had no present memory of the man's appearance.

[12] Ryan testified that he understood the differences between an automatic and a semiautomatic weapon, and that he knew the weapon was a semiautomatic.

black sneakers, near the refrigerator.  When the man ran at the victim, Ryan tackled him to the ground and the victim used the tea kettle to hit him in the head "with everything he had."  As the brothers were trying to push the man toward the door, three shots rang out and the victim slumped to the floor.  While Ryan attempted to put pressure on the wound, the intruders fled through the broken kitchen door.[13]  The victim was taken to the hospital, where he died of a gunshot wound to the head.

Neither the cellular telephone of the defendant nor the cellular telephones of the other alleged accomplices registered any activity between 3:50 A.M. and 3:53 A.M.  At 3:53 A.M., the cellular telephone associated with Bradley contacted the telephone associated with Touch and activated a cellular tower in Burlington.  At 3:59 A.M., the telephone associated with Bradley called the defendant's cellular telephone.  During this call, the defendant's telephone activated a cellular tower in Burlington, and Bradley's telephone activated a cellular tower in Woburn.  Beginning at 5:15 A.M, the defendant's cellular telephone activated a tower in Lowell, the city listed on his

---

[13] Evidence was presented at trial that Ryan told the first responding officers that there were three intruders, two of whom had been armed, and that he repeated that assertion during an interview with investigators on July 8, 2012.  During direct examination, Ryan testified that there had been four intruders, three standing together and one he saw later.  On re-direct examination, he was presented, and read portions of, his grand jury testimony, in which he described four intruders; this testimony was allowed to rebut a claim of recent fabrication.

driver's license, multiple times; one of these calls, at 6:20 A.M, was to Touch's telephone.

At around 5:20 A.M., Estabrook drove to the North Shore Medical Center seeking treatment for a head injury, shoulder pain, and back pain.[14]  He reported that he had been in a fight and that "they hit me with a tea kettle to the head."  He was wearing a red shirt, black shorts, and black high-top sneakers.[15]

Investigating officers recovered two hats at the victim's house that had not been present during the evening before the shooting, when family members and friends had stopped by to see Ryan, who had been away for six months at a residential treatment facility.  One hat, a navy blue Boston Red Sox baseball cap, was found on the porch just outside the kitchen door.  The other, a black and red Chicago Bulls baseball cap, was found in the area between the kitchen and the laundry room. The major deoxyribonucleic acid (DNA) profile on the headband of the Red Sox cap was consistent with the defendant's DNA; the contributors to the minor profile could not be identified.  The frequency of the major profile was approximately 1 in 59.07 billion in the Caucasian population, 1 in 81.9 billion in the

---

[14] A still image from surveillance footage from the hospital parking lot shows a motor vehicle, consistent with the vehicle operated by Touch, at 5:12 A.M.

[15] This clothing is consistent with Ryan's description of the clothing worn by the fourth man in the victim's kitchen.

African-American population, 1 in 92.94 billion in the Hispanic population, and 1 in 211.2 billion in the Asian population.[16] The band of the Bulls cap contained a primary DNA profile consistent with the DNA profile of an individual police concluded had not been present at the scene, because he had a curfew that required him to be in his house at night, and was being monitored by a GPS bracelet, which did not register a violation on July 7, 2012. A secondary profile found on the headband was not associated with any of the suspects.

Later on the morning of July 7, 2012, one of the victim's neighbors found a pair of rubber gloves on a side street adjacent to his house that he had not noticed the previous day. He telephoned the police; officers responded and retrieved the gloves. Forensic testing of the gloves was undertaken at the State police crime laboratory. The major DNA profile on the gloves matched the DNA profile of Adam Bradley. Analysts at the crime laboratory also found gunshot primer particles on the gloves, which allowed a forensic scientist to conclude that the person who wore the gloves either had handled a firearm or had been in close proximity to a firearm.

2. <u>Defendant's theory of the case</u>. The defendant argued that the Commonwealth presented insufficient evidence that he had been present at the scene. His strategy for doing this was

---

[16] The defendant is Asian.

to question the credibility and reliability of much of the Commonwealth's evidence.  The defendant extensively cross-examined Ryan and impeached him with evidence of his prior convictions of, inter alia, armed home invasion (with a shotgun) and causing serious bodily injury.  To further the suggestion that Ryan's testimony was unreliable, defense counsel called a State police trooper who testified that, when he arrived at the scene at approximately 4:30 $\underline{A}$.$\underline{M}$., he was given the descriptions of three suspects that Ryan had provided when officers first arrived.  Additionally, during an extended interview on July 8, 2012, Ryan told officers that he had seen the blonde-haired intruder holding a gun and two other men.  The State police trooper also testified that, during the interview on July 8, 2012, Ryan described the noise from the kitchen as the sound of a door being knocked down.  In his closing argument, the defendant highlighted that this statement was inconsistent with Ryan's grand jury testimony that he thought the sound was the family dog knocking something over.  The defendant suggested that Ryan's testimony was unreliable and that his feelings of guilt at heading toward the sound rather than telephoning police or hiding, thus resulting in his brother's death, had caused his story to change.

The defendant also challenged the forensic evidence found at the scene.  He argued that the Red Sox baseball cap with the

defendant's DNA could have been borrowed or stolen, and did nothing to establish the defendant's presence at the scene, just as the Bulls cap found in the laundry room near the back door contained the DNA of an individual who the Commonwealth acknowledged had not been present at the time of the incident.

Additionally, in cross-examining the Commonwealth's expert witness on CSLI and during his closing argument, the defendant advanced a theory that three or four vehicles must have been used, and argued that the Commonwealth's theory that only two vehicles had been used was not consistent with the most likely interpretation of the telephone calls as having been made between people who were in different vehicles, rather than between those who were in the same vehicle.[17]  Based on the calls placed between various cellular telephones, defense counsel thus argued that only certain individuals would have been in vehicles together, and, accordingly, at least a third vehicle must have been used, with likely a fourth as well.

3. Discussion.  In this appeal, the defendant argues, as he did in the Superior Court, that there was insufficient evidence to establish that he was present at the scene, that he possessed a firearm or knew that any of the intruders had a

_____

[17] Adam Bradley and Jason Estabrook have been convicted of murder in the first degree and related offenses.  Steven Touch and Sophan Keo are currently awaiting trial on indictments of murder in the first degree and other related offenses.

firearm, or that he intended to commit any crime. The defendant also argues that the admission of the CSLI evidence requires a new trial, because the records were not self-explanatory and the State police trooper who testified about them was not a representative of the cellular telephone provider and was not otherwise qualified to explain them. In addition, the defendant challenges the judge's decision not to instruct the jury, in response to their question, "if we find the defendant guilty of one or more of the underl[ying] felonies, can we still find him not guilty of felony murder?" that they could reach factually inconsistent verdicts. He also asks this court to exercise our extraordinary authority under G. L. c. 278, § 33E, to grant him relief.

a. Sufficiency of the evidence. In determining whether the Commonwealth met its burden of proof to establish each element of the offense charged, we apply the familiar Latimore standard. See Latimore, 378 Mass. at 677-678. "[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979). Although a conviction may be based entirely on circumstantial evidence, and inferences drawn need only be reasonable, not inescapable, see Commonwealth v. Rakes,

478 Mass. 22, 32, 45 (2017), a "conviction may not rest on the piling of inference upon inference or on conjecture and speculation." Commonwealth v. Lao, 443 Mass. 770, 779 (2005), citing Commonwealth v. Swafford, 441 Mass. 329, 339-343 (2004).

As the defendant was convicted as a joint venturer, "we must determine whether the evidence showed that he knowingly participated in the commission of the crime charged, alone or with others, with the intent required for the offense." Rakes, 478 Mass. at 32. See Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009). Under the theory of felony-murder, "[o]nce a defendant participates in the underlying felony, with the intent or shared intent to commit that felony, he or she becomes liable for a death that 'followed naturally and probably from the carrying out of the joint enterprise.'" Commonwealth v. Morin, 478 Mass. 415, 421 (2017), quoting Commonwealth v. Hanright, 466 Mass. 303, 307 (2013). "[I]t is no defen[s]e for the associates engaged with others in the commission of a robbery, that they did not intend to take life in its perpetration, or that they forbade their companions to kill." Morin, supra, quoting Commonwealth v. Devereaux, 256 Mass. 387, 392 (1926).

Evidence before the jury could have allowed them to conclude that Bradley, with the assistance of Marshall, formed a plan to rob the victim and his roommate, and enlisted others in the enterprise. Bradley requested Marshall's help in setting up

a robbery of the victim and his roommate, and Marshall then sent text messages to the roommate purportedly offering to sell marijuana. Bradley made telephone calls from Marshall's studio in Lynn, after which Marshall testified that she saw a number of Asian men arrive and that Bradley showed them the location of the victim's house using an Internet Web site. Two white automobiles -- one that looked to be a vehicle registered to Keo, and one that appeared to be a vehicle registered to Touch's girl friend, but routinely used by Touch -- headed to Billerica in a close procession, stopped briefly at a parking lot, then drove together towards the victim's house; their movements were captured on surveillance footage from a security camera at a convenience store near the crime scene. CSLI records established that telephones associated with the defendant, Bradley, Touch, Keo, and Arias repeatedly activated cellular towers near Billerica in the minutes before and after the shooting; the telephones all traveled toward Billerica prior to the shooting, and traveled away from Billerica in the minutes after the shooting. Four men, three of whom were armed, broke down the door and entered the victim's home, where the victim was shot and killed.

While the defendant challenged Ryan's testimony as to whether there were three or four men present in the victim's kitchen, the primary focus of the trial, and particularly this

appeal, was whether the defendant knowingly participated in the armed home invasion that resulted in the victim's death.

With respect to the defendant's knowing participation in a plan to rob the victim and his roommate, the Commonwealth presented evidence that a baseball cap with the defendant's DNA on the inner band was found immediately outside the door through which the intruders gained access to the kitchen, as well as evidence that the defendant's telephone traveled from Revere to Burlington and then to Billerica in the hours before the shooting, that the telephone activated cellular towers in Billerica minutes before the incident, and that it then traveled away from Billerica in the minutes after the victim was shot. Additionally, evidence of the defendant's possible state of mind at the time of the armed home invasion and shooting was introduced through evidence of his lengthy affiliation with most of the other alleged accomplices, some of whom he had known since childhood, and all but one of whom were described in trial testimony as being members of the Bloods gang.

Taken together, the evidence at trial would have allowed a jury to conclude that the defendant was one of the four men in the kitchen at the time of the shooting, and that he was armed with a firearm. See Commonwealth v. Netto, 438 Mass. 686, 701-702 (2003) (defendant's fingerprint in home, in conjunction with testimony that print was "fairly fresh" and evidence that

defendant had been excluded from residence for one week prior to killing, was sufficient evidence of her presence).  Contrast Commonwealth v. Morris, 422 Mass. 254, 256-258 (1996) (evidence that defendant's fingerprint was on mask found at scene of armed home invasion did not, alone, establish defendant's presence).

To prove the underlying felony of armed home invasion, the Commonwealth was required to prove that the defendant or other joint venturers "'knowingly enter[ed] the dwelling place of another'; 'knowing or having reason to know that one or more persons are present within'; 'while armed with a dangerous weapon'; and 'use[d] force or threaten[ed] the imminent use of force upon any person within such dwelling place whether or not injury occur[red], or intentionally cause[d] any injury to any person within such dwelling place.'"  See Commonwealth v. Stokes, 440 Mass. 741, 747 (2004), quoting G. L. c. 265, § 18C. For both armed home invasion and attempted armed robbery, the Commonwealth must prove either that the defendant was armed or that he knew that his joint venturers were armed.  See Commonwealth v. Brown, 477 Mass. 805, 812 (2017).

The defendant argues that there was insufficient evidence that he was armed or knew that any of the intruders were armed, or that he shared their intent to commit an armed offense.  We do not agree.  Viewing the evidence in the light most favorable to the Commonwealth, the jury reasonably could have determined

that the defendant was one of the men in possession of a firearm in the kitchen of the victim's home. Ryan testified that three of the intruders were armed.[18] The unarmed intruder was the fourth man, who was hit with a tea kettle. Based on Estabrook's medical records at the emergency room, including a statement that he had been struck by a tea kettle during a fight, and images from the hospital surveillance camera that showed him wearing clothing consistent with Ryan's description, the jury reasonably could have concluded that this unarmed man was Estabrook, who reported to medical personnel the unusual instrument that had been used during the fight. Given the permissible inference that Keo and Touch, the fifth and sixth men, had remained with their vehicles, the jury reasonably could have inferred that the defendant was in the kitchen and was armed with a firearm.[19]

---

[18] The defendant called a police witness who testified that Ryan informed him that he saw two firearms in the kitchen, rather than three. Ryan testified that there were three armed men, and that the fourth man, who was hit by the tea kettle, was unarmed. We resolve this inconsistency in favor of the Commonwealth.

[19] While Marshall testified that she told Bradley that he did not need to bring firearms, the defendant was not present when Marshall made this remark. In any event, Bradley disregarded that suggestion and brought a firearm with him to the victim's house. His decision to carry a weapon suggests that Bradley did not tell the other intruders that they were robbing "little kids" who were unlikely to offer resistance. Regardless, the testimony was clear that three of the four intruders in the victim's kitchen were carrying firearms.

b.  CSLI records.  The defendant contends that the CSLI records were not properly admitted because they were not self-explanatory and the Commonwealth did not offer a qualified witness to explain them.  He argues that a "[company] representative or other qualified individual needed to explain those records to the jury.  The person used by the Commonwealth . . . was not so qualified.  Whereas the verdicts relied on that improperly admitted evidence, the defendant's convictions must be reversed."

It is well established that CSLI records are business records.  See Commonwealth v. Williams, 475 Mass. 705, 722 n.22 (2016), citing Commonwealth v. Augustine, 467 Mass. 230, 232 (2014); United States v. Burgos-Montes, 786 F.3d 92, 119 (1st Cir.), cert. denied, 136 S. Ct. 599 (2015).  A "record [that] was made in good faith in the regular course of business" may be admissible, in the judge's discretion, notwithstanding that it is hearsay.  G. L. c. 233, § 78.  See Mass. G. Evid. § 803(6)(A) (2018).

Pursuant to G. L. c. 233, § 78, a trial judge has discretion to require a party offering a business record to call as a witness a "person who made the entry, writing or record offered or the original or any other entry, writing, document or account from which the entry, writing or record offered or the facts therein stated were transcribed or taken, or who has

personal knowledge of the facts stated in the entry, writing or record offered."  Here, the judge consulted with counsel at sidebar before the telephone records were introduced, and asked the defendant if he had any objection.  The defendant renewed the objection he had made in his motion to suppress, which had been denied prior to trial, that the records should not be admitted due to the administrative subpoena that had been used to obtain them.  The judge then inquired whether the defendant "ha[d] any objection with regard to the authenticity of these records."  The defendant did not.  Because the defendant did not object to the admission of the CSLI as an unauthenticated business record when prompted by the judge at sidebar, we review the judge's determination for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Fulgiam, 477 Mass. 20, 27, cert. denied, 138 S. Ct. 330 (2017).

The cellular telephone records contain an affidavit of the keeper of the records certifying that they are true and complete, and there is no evidence or allegation to the contrary.  The records are clearly relevant and central to the Commonwealth's case, and were described in depth by the State police trooper after he was accepted as an expert witness following an extensive voir dire.  We conclude that the judge did not abuse her discretion in allowing the introduction of the CSLI as business records.

Even where evidence may be relevant and otherwise admissible, a trial judge has discretion to exclude it if its probative value is substantially outweighed by the risk of confusion. Mass. G. Evid. § 403 (2018). See Commonwealth v. Rosa, 422 Mass. 18, 25 (1996) ("When prejudice, including confusion of the jury, is possible, the judge must weigh the probative value of the evidence against such danger"). "The trial judge [is] best situated to assess the extent to which [business records] might have been confusing to the jury." Commonwealth v. Dabney, 478 Mass. 839, 860 (2018).

The judge conducted a voir dire hearing at which she herself posed certain questions to the State police trooper who later testified about the CSLI. The trooper also was questioned extensively by the defendant's and his codefendant's counsel. He testified to having received training from State and Federal agencies, including a Department of Defense contractor, on the uses of CSLI and how to obtain it. The trooper also said that he served as a member of the Federal Bureau of Investigation's cellular analysis survey team. The judge concluded that the trooper was qualified as an expert in the area of CSLI. The trooper then testified as an expert and explained to the jury how cellular telephones interact with cellular towers, the manner in which cellular telephone service providers produce

records, and how the defendant's service provider created

"basically [an] Excel spreadsheet[]" with relevant information.

The defendant argues that the Commonwealth never elicited

that the trooper was trained by the defendant's service provider

on how to interpret that company's records.  In addition to his

years of professional experience and training, however, and

consistent with his testimony that he previously had worked with

similar records, the trooper discussed and explained differences

between the records of multiple different service providers,

including the defendant's.  This testimony supported the judge's

conclusion that the trooper was a qualified expert, and was

familiar with the defendant's service provider's particular

format.[20]

Furthermore, the defendant relies on Dabney, 478 Mass. at

859, in support of his argument that the judge should have

excluded the CSLI as more prejudicial than probative, given the

absence of testimony from an employee of the cellular service

---

[20] To support his contention that a qualified individual is needed to "decipher" the CSLI, the defendant cites two cases from other jurisdictions.  In Blue Coast, Inc. v. Suarez Corp. Indus., 870 A.2d 995, 1007 (R.I. 2005), there was no witness to introduce the records, and in Horner v. Commonwealth, 105 Pa. Commw. 59, 65-66 (1987), the witness who offered to introduce graphical records had received only a one-day training session on the records, "ten to fifteen years" before the case, and had not worked with the records in ten years.  These cases are factually distinct from the instant case, however, given that the Commonwealth in this case called a witness with relevant training and ongoing experience to explain the records.

provider.  In that case, the court determined that there was no error in a Superior Court judge's discretionary ruling limiting cross-examination of a witness concerning an invoice from a particular Web site on the ground that the business record would confuse the jury, absent an explanation from an employee of that company, because the witness had no ability to explain the meaning of certain information listed on the invoices.  Id. at 859-860.  Here, the State police trooper was able to do what the witness in Dabney was not:  he coherently explained the service provider's records and differentiated the terms that provider used to designate specific items from the terms used by other cellular telephone service providers.  In these circumstances, we discern no error in the judge's discretionary determination that the records were not unduly prejudicial.

The defendant also challenges the admission of charts created by the trooper from the CSLI records, on the ground that the jury might have been confused and believed that the charts were the actual CSLI data proffered by the service provider. The witness made clear, however, that he had created some of the reports that were presented to the jury, and that he had placed certain information pertaining to certain calls on a map using a specific computer program to do so.  Additionally, the entire set of CSLI records, which contained the data that was the basis of the trooper's testimony and his summary, was introduced by

the Commonwealth through the deputy police chief who had obtained the records from the service provider. The judge did not abuse her discretion in allowing introduction of the witness's reports and charts summarizing the CSLI reports. See Commonwealth v. Carnes, 457 Mass. 812, 825 (2010) ("Summaries of testimony are admissible, provided that the underlying records have been admitted in evidence and that the summaries accurately reflect the records"); Mass. G. Evid. § 1006 (2018).

c. Jury instruction on inconsistent verdicts. The defendant argues that the judge improperly failed to inform the jury, in response to their question, that they could return factually inconsistent verdicts. We review the judge's response for an abuse of discretion. See Commonwealth v. Monteagudo, 427 Mass. 484, 488 (1998), quoting Commonwealth v. Waite, 422 Mass. 792, 807 n.11 (1996) ("The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly").

During deliberations, the jury asked the following: "if we find the defendant guilty of one or more of the underl[ying] felonies, can we still find him not guilty of felony murder?" The prosecutor argued that the answer to the question was "no," and asked the judge to reinstruct the jury not to consider the consequences of their verdict. At first, the defendant agreed

that "the correct legal answer" is "no." The judge declined to answer the question "no." She reasoned that this answer would have foreclosed the possibility of an acquittal based on the Commonwealth's failure to prove that the killing did not occur during the commission of the predicate felonies.

The judge responded to the question by reinstructing the jury on felony-murder, explaining:

> "If the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in and shared the intent required for either or both of the charged felonies, armed home invasion of Ryan Koehler or attempted armed robbery of Quintin Koehler as I have defined those offenses for you, and the Commonwealth has proved beyond a reasonable doubt that the death occurred during the commission of the felony or felonies, then the Commonwealth has proved the offense of felony murder."

The defendant, after the jury resumed deliberations, asked the judge to reinstruct the jury, "[I]f the question deals with can you find the defendant guilty, not guilty of the murder and still find him guilty of indictments two [armed home invasion] and three [attempted armed robbery], the answer is yes." The judge declined to give this instruction.

On appeal, the defendant argues that the jury were inquiring about their ability to render a factually inconsistent verdict, and that the judge's answer on felony-murder was nonresponsive. It is undisputed that juries do have the authority to render factually inconsistent verdicts, which

allows juries to "compromise and to act out of leniency." See Commonwealth v. Diaz, 19 Mass. App. Ct. 29, 33 (1984), citing United States v. Martorano, 557 F.2d 1, 9 (1st Cir. 1977), cert. denied, 435 U.S. 922 (1978). That the jury has the power to return inconsistent verdicts, however, does not give the defendant the right to a jury instruction informing the jury of their authority to do so. See Commonwealth v. Dickerson, 372 Mass. 783, 812 (1977) (Quirico, J., concurring), abrogated on other grounds by Commonwealth v. Paulding, 438 Mass. 1 (2002). We decline the defendant's invitation to require a judge to inform the jury that they may disregard the law as it has been explained to them. The judge properly instructed the jury during her final charge that "[i]t is your duty as jurors to accept the law as I state it to you." Their power to disregard her instruction does not mean "that the trial judge must inform them of the existence of that power and instruct them on what factors they may or must consider when they are contemplating the return of a verdict other than one required on the facts found by them and the law applicable thereto." Dickerson, supra (Quirico, J., concurring). See United States v. Moran-Toala, 726 F.3d 334, 343 (2d Cir. 2013) (trial judge erred in instructing jury that it was permissible to render inconsistent verdicts).

d. _Felony-murder_. The defendant urges this court to abolish the common-law doctrine of felony-murder because, inter alia, it is inconsistent with jurisprudence on mens rea generally in criminal cases. In _Brown_, 477 Mass. at 823, we declined to abolish entirely the felony-murder rule.[21] Instead, we prospectively narrowed the application of that rule to eliminate felony-murder as an independent theory of liability. See _id_. at 825, 832-833 (Gants, C.J., concurring). As a result, a defendant no longer may be convicted of murder absent proof of one of the three prongs of malice. _Id_. The defendant does not argue that _Brown_ was wrongly decided, nor does he provide any reason for the court to revisit its decision in that case, and we decline to do so.

e. _Relief pursuant to G. L. c. 278, § 33E_. We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the degree of guilt.

4. _Conclusion_. The judgments of murder in the first degree and armed home invasion are affirmed. The judgment of attempted armed robbery is vacated and set aside, and the matter

---

[21] The defendant's initial brief was filed before this court's decision in _Commonwealth_ v. _Brown_, 477 Mass. 805, 823 (2017). While his reply brief was filed after that decision, the reply brief does not address the court's holding in _Brown_.

is remanded to the Superior Court, where that conviction shall be dismissed as duplicative.

<u>So ordered</u>.